## Elgin, Joliet & Eastern Railway Company v. Peter Malaney.

1. NEGLIGENCE—*Accidents—Lights.*—If a proper light, having been placed in a position where a light is required to be kept, is unexpectedly and without fault extinguished when in apparent good order, it must be classed as an accident for which no one is responsible.

2. FELLOW-SERVANTS—*Switching Crews are.*—Different switching crews of a railroad company frequently meeting each other in their usual duties, often running the same track, dependent for safety upon the caution of each other, brought into frequent association so that they may exercise mutual influence upon each other promotive of proper caution, are fellow-servants.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the May term, 1894. Reversed and remanded. Opinion filed December 13, 1894. Rehearing denied June 15, 1895.

WILLIAMS, HOLT & WHEELER, attorneys for appellant.

MEERS & SPRAGUE, attorneys for appellee.

MR. JUSTICE CARTWRIGHT DELIVERED THE OPINION OF THE COURT.

This is a suit brought by appellee, a locomotive engineer, for injuries received in a collision between a switch engine which he was running as a servant of appellant, in the city of Joliet, and a car being pushed by another switch engine in charge of other servants of appellant employed at the same time and place, by which he lost a leg. There was a verdict for appellee for $5,000, on which judgment was entered against appellant.

The declaration contained two counts. The first charged negligence generally in the management of the switch engine which was pushing the car with which plaintiff's switch engine collided, and the second charged negligence in not having any trainman stationed on the front of that car with proper signals to enable plaintiff to avert the collision. Under a rule of court plaintiff filed seven specifications of negligence intended to be charged under the first count, five of which related to a failure to give signals, and there was no evidence tending to prove the others. The ground upon which it was sought to charge the defendant at the trial, and which it is now claimed rendered it liable, is that plaintiff, while running his switch engine with due care, was injured in consequence of the other switch

engine pushing cars toward him on the same track without a proper signal light to give warning of its approach.

The following were the material facts proved at the trial: The main line of defendant's railway runs through East Joliet, and at that place there are yards with a system of tracks, and a round house. The city depot where passengers are delivered, known as the Cass street depot, is in the city of Joliet about two miles from the yards, and is reached by a single track from the main line at the yards. Along the track to the city depot are side or switch tracks, connecting with the rolling mills and other roads. On January 28, 1892, and before that time, defendant was accustomed to deliver cars to the Chicago & Alton Railroad, the Rock Island Railroad, the Santa Fe Railroad and the rolling mills, and for the purpose of doing that and other necessary work at that place had five switching crews running switch engines. There were three day and two night crews. The crew to which plaintiff belonged consisted of himself as engineer, Henry Lozch, fireman, Frank O'Brien, foreman, and Frank Hogel, helper. They commenced work in the morning at seven o'clock and worked in the East Joliet yards and along the track to the city depot delivering transfers and doing other switching work. They had a right to quit at six o'clock in the evening provided their work was done by that time, but had no right to quit until it was finished. They very seldom quit work at that time as the work was usually not finished, and they were accustomed to get through and quit at various times up to nine or ten o'clock. The crew working with the other switch engine which was in the collision consisted of J. H. Samuels, foreman, Michael Connors, helper, and an engineer and fireman. Their time to commence work was 6:30 o'clock in the evening and they worked during the night. Train No. 6 on the main line was due at East Joliet at 6:45 in the evening, and was a freight train running from Waukegan with a combination passenger coach attached. On its arrival it was the duty of the last named crew to take the coach and any freight car that should go to the city depot,

and push them down the track to that depot.   When plaintiff's crew were at work down in the city after that time they were liable to meet the crew with the coach.   That would sometimes happen several times a week and sometimes it would not.   If plaintiff was near the city depot he would take his engine on the side track at Cass street on such occasions, and occasionally he went in on the side track at the rolling mills near Collins street to let the other crew pass.   Plaintiff's crew was also accustomed to meet the other switch engine and crew in the yards when working during the same time.

The switch engines had no schedule time or rules in their work, but were subject to the control of the yardmaster, who gave orders to the foreman of each crew what work to do, and the several crews did their work by sight with reference to their mutual safety and convenience.   If they met in their ordinary work the one which could most conveniently get out of the way of the other did so, and accepting plaintiff's statement as correct, that was the understanding whenever he met the crew with the coach in the evening.

On the evening of January 28, 1892, plaintiff and his crew in the prosecution of their usual work were down at the city depot, and left there according to his testimony at 6:42 P. M.   Most of the witnesses think that the collision was at about 7.   He was backing his engine up the track with a light at each end, when the other engine and crew which had taken the coach and a box freight car from train No. 6 were coming down the track pushing the coach with the freight car ahead of it.   When the engines neared each other between Ohio and Jackson streets, there was no light on the box car, and it struck the tender of plaintiff's engine and caused his injury.   It was the custom for one of the crew under such circumstances to ride upon the front end of the freight car with a lantern as a signal, and also to give signals to the engineer pushing the cars.   It was known that plaintiff's crew were down in the city, and such a light was proper and necessary under the circumstances.

Plaintiff himself proved that the foreman, Samuels, was

on the freight car in the proper place with a lighted lantern
when the car left the East Joliet yards, and he was still
there after having run about a mile at the curve at Collins
street, where he gave a slow up signal to the engineer when
going round the curve.   Distances were estimated by wit-
nesses and may not be correct, but the estimated distance
from that point to the place of collision was about three-
fourths of a mile.   The question whether there was any
signal light near the time of the collision depended on the
testimony of plaintiff and Samuels.   No one of plaintiff's
crew but himself was looking out for the other engine.   The
foreman and helper were on the foot board at the front of
the engine, where they could not see, and the fireman was
putting in coal until the moment of the collision, when he
got under the seat.   Plaintiff was at the right side of his
cab on the outside of a slight curve, but the tender was so
low as not to interfere with sight, and he was looking for-
ward but saw no light, and first saw the box car when about
four or five car lengths from it.   Samuels' statement on the
subject was that he remained in his position on the car with
his lantern filled, lighted and apparently in good order all
the way down, and when he saw the headlight of the plaint-
iff's engine approaching, he attempted to give his engineer
the usual stop signal, by swinging the lantern crosswise of
the track, but when just in front of him in making the sig-
nal it went out for some unknown reason, and that he then
whistled, started for the other end of the car and swung
over the side to go down the hand rail, which was the last
he remembered.   The helper inside the passenger coach
heard the whistle and Samuels was found injured after the
collision on the ground by the car.   Of course if a proper
light was unexpectedly and without fault extinguished when
in apparent good order, it would have to be classed as an
accident for which no one would be responsible, but the jury
had the witnesses before them and relied upon. plaintiff's
statement that there was no light.   If plaintiff was looking
ahead he could see the lantern as soon as Samuels could see
the headlight, and as he saw none the jury might find that

there was none. They necessarily so found, and the remaining question which would determine plaintiff's right to hold defendant for the consequences, was, whether defendant was responsible to him for the negligence of one of the other crew.

Upon that question there is no complaint that the law was not correctly given to the jury, but it is claimed that the undisputed facts brought the crews of the two switch engines within the rule of law constituting them fellow-servants and within the definition of that relation given to the jury, which excepted defendant from liability for the neglect of one of their number. We have already stated those facts, from which it appears that the two crews were engaged in the service of a common master in the same line of employment at the same place; that their duties and service frequently extended over a period of time in the evening when both were at work; that they frequently met when so at work at the same time, and that when they were so thrown together, their movements with relation to each other were controlled and governed by considerations of their mutual safety and convenience. We can not doubt that if their hours of service had been the same they would be fellow-servants, and this does not seem to be disputed. Switching crews in the same yards were deemed fellow-servants. In O'Leary, Admx., v. Wabash R. R. Co., 52 Ill. App. 641, Chicago & Eastern Illinois R. R. Co. v. Geary, 110 Ill. 383, where a night watchman in a yard was injured by the negligence of the foreman of a night switching crew in the same yard, it was held that they were clearly fellow-servants within the legal meaning of the term. But it is argued that in this case the crews were not together enough of the time to bring them within the rule. No doubt if their association had been constant, their opportunities for observation, influence and caution and for avoiding the effect of the negligence of each other would have been greater, but the length of time that the association exists has not been regarded as affecting the relation. In Abend v. T. H. & I. R. R. Co., 111 Ill. 202, a wrecking force had been made up of servants of the railroad company without regard to their

usual employment, and they were all held to be for the time being fellow-servants. In C. & A. R. R. Co. v. Hoyt, 123 Ill. 369, it was said that a car inspector and engineer might be fellow-servants in the strictest sense, and yet they might not have been associated an hour before the happening of an injury, and that what is meant is, that if the parties continue to be engaged in a common service, they will be habitually associated, so that they may exercise influence over each other promotive of common safety.

These crews frequently met each other in their usual duties, and often ran over the single track, dependent for safety upon the caution of each other. In that service they were brought into frequent association so that they might exercise mutual influence upon each other promotive of proper caution. We do not think it necessary that all or any specific number of their hours of service should be the same.

Being of the opinion that the switching crews were fellow-servants, the judgment will be reversed and the cause remanded.